**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

DIANE M. JOHNSON,
                                    Plaintiff,

            v.                                          Civil No. 6:01-CV-1881
                                                              (NAM/RFT)
JO ANNE B. BARNHART,
Commissioner of Social Security
                                    Defendant.

**APPEARANCES:**                                    **OF COUNSEL:**

OLINSKY, DIMARTINO LAW FIRM                    HOWARD OLINSKY, ESQ.
Attorney for Plaintiff
186 West First Street
Historic First National Bank
Oswego, New York 13126

HON. GLENN T. SUDDABY                          WILLIAM H. PEASE, ESQ.
United States Attorney for the Northern District of New York    Assistant United States Attorney
Attorney for Defendant
Office of the United States Attorney
P.O. Box 7198
100 South Clinton Street
Syracuse, NY 13261-7198

**RANDOLPH F. TREECE**
**U.S. MAGISTRATE JUDGE**

**REPORT-RECOMMENDATION AND ORDER**

        Plaintiff Diane Johnson brings this action, pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3),

for a review of a decision by the Commissioner of Social Security ("Commissioner") denying her

application for Supplemental Security Income ("SSI") benefits.[1]  For the following reasons, this

_____

        [1] This matter has proceeded in accordance with General Order 18 of this District, which sets forth the
procedures followed in appealing a denial of Social Security Benefits.  The parties have filed briefs, though oral
argument was not heard.  Dkt. Nos. 10 & 12. The matter was referred to the undersigned for a report-recommendation
pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(d).

Court recommends the Commissioner's decision denying benefits be **affirmed**.

## I. PROCEDURAL HISTORY

Johnson protectively filed an application for SSI benefits on October 22, 1999, alleging a disability onset date of June 1, 1991. Dkt. No. 8, Admin. Tr. [hereinafter Tr.] at 79-81. Her application was denied initially and on reconsideration. Tr. at 54-66. Johnson had previously filed an application for disability benefits on July 14, 1995, which was initially denied on January 3, 1996. Tr. at 16. Johnson never appealed that determination. After the more recent application was denied initially, and on reconsideration, Johnson requested a hearing before an Administrative Law Judge ("ALJ"). Tr. at 67-68. The hearing was held before ALJ John P. Chwalek on June 23, 2000. Tr. at 33-53. The ALJ first determined there was no good cause shown to reopen the 1995 application. Tr. at 16. Thereafter, the ALJ issued an unfavorable decision, dated October 4, 2000, based solely on the recent application. Tr. at 16-23. On November 2, 2001, the Appeals Council denied Johnson's request for review, making the ALJ's decision the final decision of the Commissioner. Tr. at 6-7. Exhausting all her options for review through the Social Security Administration's tribunals, Plaintiff now brings this appeal.

## II. BACKGROUND

Johnson, born on January 26, 1953, stands approximately five-feet two-inches tall and weighs two hundred forty-eight pounds. Tr. at 146. Johnson has completed her high school education, as well as two years of college, and is pursuing her bachelor's degree part time. Tr. at 38. Johnson, an unemployed mother of four, remains at home to care for her eight-year-old twins. Tr. at 36-41. Johnson last worked on a regular basis in 1987 at a temporary clerical receptionist position. Tr. at 40. Since 1987, Johnson has attempted to work temporary clerical jobs to maintain her public

assistance but has been unable to keep them because of her behavior at work.  Tr. 50-51.

Johnson has had a prolonged history of mental and medical impairments.  In 1992, she was diagnosed by the Oswego County Council on Alcoholism Clinic Director with alcohol dependence (moderate, in remission), adjustment reaction with mixed emotional features (co-dependency), post traumatic stress disorder (due to past sexual abuse).  Tr. at 142-143.  Additionally, she had high blood pressure, was severely overweight, and had allergies.  *Id.*  At the time of Johnson's hearing before ALJ Chwalek, she alleged disability due to a mental condition marked by "severe depression and [an] anxiety problem" as well as diabetes.  Tr. at 67.

 In October of 1998, Johnson's treating physician since 1990, Joseph Mather, M.D., listed her treating diagnoses as anxiety, diabetes, and anovulation.  Tr. at 146.  On past visits, Dr. Mather noted that Johnson was "very emotional," and had encouraged her to continue counseling.[2]  Tr. at 153.  On August 31, 1999, Johnson's other treating physician, Corliss Varnum, M.D., who had been treating Johnson since 1991, diagnosed her with diabetes, hypercholesterolemia, and obesity.  On prior visits Dr. Varnum had noted that Johnson was a "very anxious lady," that she experienced "a lot of anxiety," and that she had "a lot of emotional problems."  Tr. 183-84.  Dr. Varnum also prescribed continued counseling to Johnson on more than one occasion.  Tr. at 163-64.

On December 8, 1999, Johnson was prescribed 20 mg of Prozac daily by Suresh Patil, M.D., to help her deal with her anxiety and depression.  Tr. at 251.  According to Dr. Patil's notes, Johnson related that her anxiety stemmed from uneasiness with being separated from her children, whom she worried would not return when they went to school.  *Id.*  This anxiety drove Johnson to picking her children up from school personally, rather than wait for the bus to drop them off.  *Id.*

---

[2] Johnson had been participating in individual counseling sessions on and off since at least 1992.  Tr. at 145.

Dr. Patil noted, after a follow up visit in January of 2000, that there was apparently no change in Johnson's depression despite the medication.  Dr. Patil urged Johnson to increase her dosage, but she refused.  Tr. at 248.

Kalyani Ganesh, M.D., and Kristen Barry, Ph.D., administered consultative examinations for the Social Security Administration.  Dr. Ganesh gave Johnson an internal medicine examination. Tr. at 212.  After examining Johnson, Dr. Ganesh noted Plaintiff exhibited no "gross physical limitations to sitting, standing, walking, climbing, bending or the use of her extremities," and surmised that she suffered from anxiety, depression, and panic attacks, as well as a history of diabetes which is managed by a diet, hypertension, arthritis, seasonal allergies, and obesity.  Tr. at 214.  Johnson was also given a consultative psychological evaluation by Dr. Barry.  Tr. at 220-25. At the outset of the examination, Johnson informed Dr. Barry that she had been experiencing anxiety since 1994, and that she was constantly worried about her children when apart from them, which typically led to the onset of panic attacks.  Tr. at 222.  Dr. Barry noted that Johnson was anxious throughout the evaluation and that the anxiety impaired Johnson's attention and concentration as well as recent and remote memory skills.  Tr. at 222-23.  Dr. Barry diagnosed Johnson with anxiety disorder NOS (Not Otherwise Specified), depressive disorder NOS, histrionic personality disorder, as well as allergies, sinus problems, diabetes, hypertension, and bronchial asthma.  Tr. at 224.  Dr. Barry concluded that Johnson would have "difficulty making appropriate decisions and demonstrating consistency in job performance."  *Id*.

On February 20, 2000, Johnson was seen by Prasad Lakshman, M.D., Oswego Hospital staff psychiatrist as well as her psychiatric social worker Ann C.R. Millet, MS, MSW, CSW, for a

scheduled visit.  Tr. at 284.  At that time, Johnson was diagnosed with dysthymia[3] as well as

dependent personality disorder.  *Id.*  It was also noted that Johnson was taking the Prozac prescribed

by the clinic and that she believed the medicine considerably helped to reduce her anxiety.  *Id.*

Finally, for the ALJ Hearing, Johnson's physical and mental capability to do work related

activities was evaluated.  After physically evaluating Johnson on June 20, 2000, her treating

physician, Dr. Varnum, stated that Johnson could occasionally lift up to fifty pounds, carry up to

twenty pounds, and could frequently lift up to twenty pounds, and carry up to ten pounds.  Tr. at

288.  Dr. Varnum noted that Johnson's capabilities to sit, stand, walk, and use her hands and feet

were all unaffected by any impairment.  Tr. at 289.  Moreover, Dr. Varnum also related that Johnson

could perform all postural activities, as well as push and pull occasionally, and could frequently

reach, handle, and feel.  Tr. at 290.  On June 24, 2000, Johnson's psychiatric social worker, Ms.

Millet, completed an assessment of Johnson's mental ability to do work related activities based on

her June 8, 2000 evaluation of Johnson.  Tr. at 292-95.  This assessment rated Johnson's mental

ability to do work related activities as fair (ability to function is limited but satisfactory) or good

(ability to function is more than satisfactory) in every category.  Tr. at 293.

### III.  STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is limited to determining whether the

correct legal standard was applied and whether the decision was supported by substantial evidence.

*See Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991); *Johnson v. Bowen*, 817 F.2d 983, 985 (2d

---

[3] Dysthymia is defined as "a mood disorder characterized by depressed feeling (sad, blue, low, down in the dumps) and loss of interest or pleasure in one's usual activities and in which the associated symptoms have persisted for more than two years but are not severe enough to meet the criteria for major depression."  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 519 (28th ed. 1994).

Cir. 1987). Substantial evidence is defined as "more than a mere scintilla," it is "such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). For a reviewing court to conclude that the decision is supported by substantial evidence, the ALJ must have set forth the factors justifying his or her findings with sufficient specificity. *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984). Excepting instances where there is a reasonable basis for doubting whether the ALJ applied the appropriate legal standard, when substantial evidence exists in the record to support the Commissioner's findings, the findings are conclusive and cannot be substituted with a court's interpretation of the record. *Diaz v. Shalala*, 59 F.3d 307, 312 (2d. Cir. 1996); *Williams ex rel Williams*, 859 F.2d at 258. When there is a reasonable basis for doubting whether the ALJ applied the correct legal standard the court may not affirm the ALJ's decision, even if the ultimate decision is supported by substantial evidence. *Johnson*, 817 F.2d at 986.

## IV. DISCUSSION

### A. The Five-Step Disability Determination

Under the Social Security Act, a claimant is disabled if he or she is unable "to engage in any substantial activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382(c)(3)(A). Further, the severity of the claimant's impairment must be such that the claimant is not only "unable to do [their] previous work but cannot, considering [their age], education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id*. at § 1382(c)(3)(B).

The Commissioner has established a five-step evaluation process for determining whether a claimant is disabled.  The Second Circuit has delineated the steps in this process as follows:

> [1] First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. [2] If he [or she] is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his [or her] physical or mental ability to do basic work activities. [3] If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment [which meets or medically equals the criteria of an impairment] listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him [or her] disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. [4] Assuming the claimant does not have a "listed" impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he [or she] has the residual functional capacity ["RFC"] to perform his [or her] past work. [5] Finally, if the claimant is unable to perform his [or her] past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see also* 20 C.F.R. §§ 404.1520 & 416.920.

In this process, the claimant bears the burden of proof as to Steps One through Four.  If the claimant satisfies this requirement the burden shifts to the Commissioner to prove Step Five.  *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999).

## B.  ALJ Chwaklek's Findings

Applying the Five-Step disability determination process, the ALJ found that: (1) Johnson had not engaged in substantial gainful activity since October 22, 1999; (2) Johnson's dysthymia is a severe impairment but her other medical conditions were under medical or dietary control and were not severe; (3) Johnson's severe dysthymia does not meet or medically equal an impairment listed in Appendix 1 of the Regulations; (4) Johnson has no past relevant work and, given her exertional and

non-exertional limitations, she retains the RFC to perform light exertional activity;[4] and (5) Johnson's RFC enables her to perform the normal duties of jobs that exist in significant numbers in the national economy.[5]  Tr. at 22.

## C. Johnson's Contentions

In her brief, Johnson contends that the ALJ's decision denying benefits should be reversed because (1) at Step Two, the ALJ erred by finding that her anxiety was not severe; (2) at Step Three, the ALJ erred by finding her anxiety did not meet or equal an impairment in the Listing; (3) at Step Five, the hypothetical question posed by the ALJ to the vocational expert did not accurately portray the limitations caused by her non-exertional impairments; and (4) her July 14, 1995 Application, initially denied on January 3, 1996, should be reopened for good cause.  Dkt. No. 10.  The Court will consider each of Johnson's contentions.

### 1. Step Two–Severity of Impairments

Johnson initially argues that the ALJ erred in failing to consider her anxiety severe at Step Two disability evaluation process.  Dkt. No. 10 at pp. 8-10.  It is the opinion of the undersigned that

---

[4] Specifically, the ALJ stated that Johnson's exertional activity was limited to
> lifting up to 20 pounds frequently, carry 10 pounds frequently and 11-20 pounds occasionally.  She is not restricted in sitting, standing, walking or in the use of her hands and occasionally can climb, balance, stoop, crouch, kneel and crawl, and frequently can reach, handle, feel and occasionally push and pull.

Tr. at 21.

The ALJ also noted Johnson experienced non-exertional limitations
> due to a fair ability to follow work rules, relate to co-workers, deal with the public, use judgement, deal with work stress and maintain attention and concentration.  She has a good ability to interact with supervisors and function independently, remember, carry out from simple to complex job instructions and maintain personal appearance, and she has a fair ability to behave in an emotionally stable manner, relate predictably in social situations and demonstrate reliability.

Id.

[5] Because Johnson exhibited non-exertional limitations, the ALJ secured the testimony of a vocational expert in meeting his burden at Step 5.  Tr. at 21 & 124-37.

Johnson misinterprets the ALJ's findings, and that the ALJ properly considered Johnson's anxiety in conjunction with her dysthymia, which the ALJ found to be a severe impairment at this Step of the analysis.

Step Two of the Five-Step evaluation process demands that the claimant prove they have a severe impairment that significantly limits their physical or mental ability to do basic work activities. *See* 20 C.F.R. § 416.920(c). Basic work activities are "the abilities and aptitudes necessary to do most jobs," including:

> (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;
> (2) Capacities for seeing, hearing, and speaking;
> (3) Understanding, carrying out, and remembering simple instructions;
> (4) Use of judgment;
> (5) Responding appropriately to supervision, co-workers and usual work situations; and
> (6) Dealing with changes in a routine work setting.

*Id*. §§ 416.921(b)(1)-(6).

The Second Circuit holds that the Step Two analysis "may do no more than screen out *de minimis* claims." *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2nd Cir. 1995). If the disability claim rises above a *de minimis* level, then the remaining analysis of the claim at Steps Three through Five must be undertaken. *See id*. Furthermore, when a claimant has multiple impairments, the Second Circuit has also recognized the necessity of considering the combined effect of the claimant's impairments in determining disability as well as the claimant's ability to work, regardless of whether every impairment is severe. *Id*. at 1031.

In this instance, the ALJ properly addressed Johnson's anxiety as a facet of an overarching impairment, which he deemed severe, that is, her dysthymia. The ALJ chronicled Johnson's medical history with anxiety and depressive disorders throughout his decision. Tr. at 18-20. After

doing so, the ALJ adopted the verbiage of the most recent medical diagnosis of Johnson's mental

ailments in concluding that Johnson suffered from dysthymia.  Tr. at 19.  This diagnosis by

Johnson's psychiatric social worker and the staff psychologist was taken from a clinical psychiatric

assessment which specifically referenced Johnson's ongoing problems with anxiety and depression

before concluding that dysthymia was her sole Axis I Clinical Disorder.  Tr. at 284.  The ALJ

thereafter determined that Johnson's dysthymia was a severe impairment within the meaning of the

Regulations, and continued through the remaining steps of the evaluation process.  Tr. at 19-23.

Significantly, when the ALJ assessed Johnson's dysthymia at Step Three of the evaluation process,

he compared it to Listing Level 12.04, which sets the standard for severe Affective Disorders, as

well as Listing Level 12.06, which sets the standard for severe Anxiety Related Disorders.  Tr. at 4-

31; *see also* 20 C.F.R. § 404, Subpt. P, App. 1, §§ 12.04-12.06 (Listing Levels for Affective

Disorders and Anxiety Disorders, respectively).  In making the comparison, the ALJ specifically

noted the presence of Johnson's anxiety and panic attacks.  Tr. at 27.  Therefore, although the ALJ

did not explicitly mention Johnson's anxiety as a severe impairment, or part of a combination of

impairments in his decision, the ALJ fully considered all functional impairments cited by Plaintiff.

"The ALJ is not required to cite and discuss each and every symptom or illness claimed by a

disability claimant, only to consider the effect of all of [her] impairments."  *Flors v. Massanari*,

2002 WL 100631, at * 5 (S.D.N.Y. Jan. 25, 2002); *see also Berry*, 675 F.2d at 469 (affirming an

ALJ's decision despite failure to explain reasons for rejecting claimed impairments, when other

portions of the decision and clearly credible evidence supported the determination).  Therefore,

substantial evidence supports the conclusion that the ALJ did not err in treating Johnson's anxiety as

part and parcel of her dysthymia, a condition that he did find severe within the meaning of the

Regulations.

*2.  Step Three–Listed Impairment*

Johnson's next contention is that the ALJ erred at Step Three of the Five-Step disability

evaluation process by failing to find that her anxiety met or medically equaled the Listing Level

requirement for anxiety related disorders.  Dkt. No. 10 at pp. 10-12.  In order to be considered

disabled due to an anxiety related disorder at Step Three of the disability evaluation process, a

claimant must meet the requirements of 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.06.  The 12.06

requirements include three subsections A, B, and C.  In order to meet the standard set by 12.06, a

claimant must prove that their disability meets the requirements of subsection A and subsection B,

or subsection A and subsection C:

> A.  Medically documented findings of at least one of the following:
> > 1. Generalized persistent anxiety accompanied by three out of four of the following signs or symptoms:
> > > a. Motor tension; or
> > > b. Autonomic hyperactivity; or
> > > c. Apprehensive expectation; or
> > > d. Vigilance and scanning; or
> > 2. A persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation; or
> > 3. Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week; or
> > 4. Recurrent obsessions or compulsions which are a source of marked distress;
> > > AND
> B.  Resulting in at least two of the following:
> > 1. Marked restriction of activities of daily living; or
> > 2. Marked difficulties in maintaining social functioning; or
> > 3. Marked difficulties in maintaining concentration, persistence, or pace; or
> > 4. Repeated episodes of decompensation, each of extended duration.
> > > OR

C.  Resulting in complete inability to function independently outside the area of one's home

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.06.

In determining whether a mental impairment exists, the ALJ must review the record for any evidence of symptoms, signs, or laboratory findings indicating a mental impairment.  *Id*. § 416.920a(b).  In the context of mental impairments, symptoms are the claimant's description of their impairments, and "signs are medically demonstrable phenomena that indicate specific psychological abnormalities, *e.g.*, abnormalities of behavior, mood, thought, memory, orientation, development, or perception, as described by an appropriate medical source."  *Id*. Pt. 404, Subpt. P, App. 1, § 12.00(B).  It is the claimant's burden to furnish evidence of the impairment from acceptable medical sources, which include physicians and psychologists.  *Id*. § 416.913(a)(1)-(2).  Evidence from other medical sources, as well as non-medical sources may also be considered.  *Id*. § 416.913(d).

Johnson claims initially that she satisfies the requirements for 12.06(A) because her fear of separation from her children is "a persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity or situation" in satisfaction of 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.06(A)(2).  Dkt. No. 10 at p. 11.  In support of this claim, she offers a psychiatrist's medical notes which memorialize Johnson's report to him that she was anxious and that the anxiety stemmed from worrying about her kids when they are at school and away from her.  Tr. at 251.  The psychiatrist further noted that as a result of Johnson's anxiety, she experienced sweaty palms, palpitation of the heart, and feelings of discomfort and restlessness.  *Id.*  Johnson also offers the notes of a consultative psychiatrist which recorded Johnson's statement that she had been experiencing anxiety since 1994 and the anxiety was caused by constant worry about her children and bad things which might happen to them.  Tr. at 221.  The consultative psychiatrist

-12-

also noted that Johnson believed her thoughts were irrational but could not relinquish them, and also that Johnson claimed she suffered from panic attacks whenever she is not with her children.  *Id*. Finally, Johnson offers the notes of her psychiatric social worker which recount a statement of Johnson's that her anxiety over her children was interfering with her life because she felt that she could not leave the children out of sight or with a babysitter without feelings of panic.  Tr. at 255.

Whether or not this Court were to find that Johnson's symptoms alone, without any corroborating signs, satisfied the criteria for subsection A of 12.06 is irrelevant.  Even if this Court were to find that Johnson satisfied the criteria for subsection A, she cannot satisfy the listing level requirement for Anxiety Related Disorders because she cannot satisfy the requirements of 12.06(B), or 12.06(C).

In order to satisfy 12.06(B), a claimant must prove that their medically determinable impairment results in two out of four listed restrictions.  20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.06(B)(1)-(4).  Johnson contends that she met the criteria under 12.06(B) because her anxiety resulted in marked difficulties in maintaining social functioning, as well as marked difficulties in maintaining concentration, persistence, and pace.  *Id*. at § 12.06(B)(2)&(3).  To support this contention, Johnson provides the consultative evaluation of Dr. Barry, who observed Johnson's social skills as fair to poor and noted impairments in concentration and memory skills.  Tr. at 223-24.  Johnson also points to the observation of her psychiatric social worker that Johnson struggled with relationships within her family as well as her peers and, at times of stress, Johnson is "inappropriate with her boundaries."  Tr. at 252.

According to the Regulations;

*Social functioning* refers to your capacity to interact independently, appropriately,

effectively, and on a sustained basis with other individuals.  Social functioning includes the ability to get along with others, such as family members, friends, neighbors, grocery clerks, landlords, or bus drivers.  You may demonstrate impaired social functioning by, for example, a history of altercations, evictions, firings, fear of strangers, avoidance of interpersonal relationships, or social isolation.  You may exhibit strength in social functioning by such things as your ability to initiate social contacts with others, communicate clearly with others, or interact and actively participate in group activities.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(2) (emphasis in original).

This Court believes that the ALJ applied the correct legal standard, and that there is substantial evidence in the record to support the ALJ's finding that Johnson suffers only from moderate, and not marked, difficulty in maintaining social functioning.  At Johnson's hearing, the ALJ spoke with her at length about her collegiate experience, and Johnson related that she went to school four days a week throughout the semester prior to the hearing, and was scheduled to go three days a week that upcoming semester.  Tr. at 38.  Johnson traveled to and from school by taking the bus, related that she was doing well in school, and noted that she had scheduled a conference with a professor whose class she had been deficient in.  *Id*.  Johnson mentioned that she planned to resume going to group meetings, that she had a good friend, and also spoke of a neighbor who was a close friend of hers.  Tr. at 46.  Johnson further told the ALJ that conversed with relatives on the telephone and also visited with them occasionally.  Tr. at 47.  Also, Johnson told the ALJ that her daughter had driven her to the hearing.  Tr. at 37.

Furthermore, in an undated Department of Social Services form, designed to describe a client's daily activities, it was noted that Johnson attended church on a regular basis, went dancing with her friends twice a month, and took day-trips with family as often as she could.  Tr. at 109.  Dr. Ganesh, the Agency Consultative Physician, noted that Johnson arrived for her examination with her sister and her niece.  Tr. at 212.  Dr. Ganesh noted that Johnson's sister drove her to her

-14-

appointment that day and also that Johnson is dependent upon public transportation or her sister to get around.  Tr. at 213.  Dr. Ganesh further wrote that Johnson indicated one of the things she could do was socialize, and her activities included going out.  *Id*.  Dr. Ivan Fras, a physician who reviewed Johnson's file and completed a psychiatric review technique form, concluded that Johnson had only slight difficulty in maintaining social functioning.  Tr. at 231.  Finally, Dr. Mata, another physician who reviewed Johnson's file, independently arrived at the same conclusion, that is, Johnson only experienced slight difficulty in maintaining social functioning.  Tr. at 278.  Thus, substantial evidence exists in the record to support the ALJ's determination that Johnson did not have marked difficulty maintaining social functioning.

Johnson also argues that she meets the qualifications for 12.06(B) because her anxiety has caused her marked difficulty in maintaining concentration, persistence, and pace.  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.06(B)(3).  To support this argument Johnson again relies upon the consultative evaluation of Dr. Barry, which opines that Johnson's anxiety results in significant limitations in concentration, which manifests itself in her significant struggle with simple calculations and memory.  Tr. at 223.   The Regulations state that concentration, persistence and pace refers to:

> the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings.  Limitations in concentration, persistence, or pace are best observed in work settings, but may also be reflected by limitations in other areas.  In addition, major limitations in this area can often be assessed through clinical examination or psychological testing.  Wherever possible, however, a mental status examination or psychological test data should be supplemented by other available evidence.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C).

It is this Court's opinion that the ALJ's finding that Johnson did not have the required

frequent deficiencies of concentration, persistence, nor pace is supported by substantial evidence.

Again, the ALJ spoke at length with Johnson about her college studies.  Johnson told him that she

went to school several days a week, and was generally a good student.  Tr. at 38.  This was

corroborated by Johnson's psychiatric social worker, Ann Millet, and staff psychiatrist, Dr. Prasad

Lakshman, who observed Johnson pursuing her college studies with minimal difficulties.  Tr. at

284.  Dr. Lakshman and Millet also observed, in contrast to the observations of Dr. Barry, that

Johnson was "oriented to person, place, and time, with adequate recent and remote memory

functions."  *Id.*  This was a recurrent observation by Millet, who made the same observation ten

months prior to Dr. Barry's consultative examination as well as through to a mental evaluation one

month prior to the hearing.  Tr. at 261 & 292.  Further, when asked to complete an assessment of

Johnson's mental ability to do work related activities, Millet found that Johnson's ability to

maintain attention and concentration was limited but satisfactory.  Tr. at 293.  Millet also found

Johnson's ability to understand, remember, and carry out simple, detailed, and complex job

instructions to be more than satisfactory.  Tr. at 294.

Moreover, the conclusions of the two physicians assigned to review Johnson's file support

the ALJ's determination.  Dr. Ivan Fras reviewed the file and concluded that Johnson seldom had

deficiencies of concentration, persistence, or pace.  Tr. at 231.  In completing a Residual Functional

Capacity Assessment, Dr. Fras marked all defined areas of understanding and memory, as well as

sustained concentration and persistence as only moderately or not significantly limited.  Tr. at 233-

34.  Months later Dr. Mata reviewed the file and made exactly the same conclusions.  Tr. at 278-81.

Therefore, substantial evidence exists in the record to support the ALJ's conclusion that, although

Johnson experienced some deficiencies of concentration, persistence, and pace, she did not

frequently experience those deficiencies as is required by 12.06(B)(3).

Because Johnson never argued, nor does the record support, the claim that her impairments result in complete inability to function independently outside her home, she also does not meet the requirements of 12.06(C).  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.06(C).  Therefore, because her condition does not meet or medically equal a Listed Impairment, Johnson's claim that the ALJ erred at Step Three is nullified

### 3.  Step Five–Hypothetical Question

Johnson also claims that the ALJ erred at the Step Five by posing an incomplete hypothetical question to the vocational expert, and then erroneously relying upon the answer to that question in finding Johnson capable of performing substantial gainful activity that is available in the national economy.  Dkt. No. 10 at pp. 12-17.  Johnson claims that the hypothetical question was incomplete because it was formulated around a description of Johnson's non-exertional limitations taken from Ann Millet, Johnson's psychiatric social worker, who is not an acceptable medical source under the Regulations.  *See* 20 C.F.R. § 416.913.  Johnson avers this error renders the hypothetical question incomplete because it adopts the opinion of a non-medical source, thereby excluding an opinion by Dr. Barry, the consultative psychiatrist, who, in her medical assessment, attributes more severe non-exertional impairments to Johnson.  Dkt. No. 10 at pp. 12-17.

Because Johnson's condition was compounded by severe non-exertional limitations, which limited the range of work she could perform, the Commissioner's burden at Step Five required the ALJ to introduce testimony from a vocational expert.  *Rosa v. Callahan*, 168 F.3d 72, 78 (2d Cir. 1999) (quoting *Bapp v. Bowen*, 802 F.2d 601, 603 (2d Cir. 1986)).  However, "a vocational expert's testimony is only useful if it addresses whether the particular claimant, with his limitations and

capabilities, can realistically perform a particular job." *Aubeuf v. Schweiker*, 649 F.2d 107, 114 (2d Cir. 1981) (citing *Parker v. Harris*, 626 F.2d 225, 231 n.5 (2d Cir. 1980)); *see also Miller v. Barnhart*, 2003 WL 749374, at * 8 (S.D.N.Y. Mar. 4, 2003). This Court reviews the hypothetical question solely to determine whether there is "substantial record evidence to support the assumption upon which the vocational expert based his opinion." *Dumas v. Schweiker*, 712 F.2d 1545, 1554 (2d Cir. 1983); *see also Miller*, 2003 WL 749374, at * 8.

In our case, there is substantial evidence of record to support the validity of the ALJ's hypothetical question, the assumptions upon which the vocational expert based his opinion, and the ALJ's reliance on the vocational expert's testimony. Johnson's argument fails initially because it presupposes that formulating the hypothetical question around the opinion of someone who isn't an acceptable medical source is an error. Evidence, opinion or otherwise, from an acceptable medical source is necessary to establish the existence of a medically determinable impairment. 20 C.F.R. § 416.913(a). However, once the existence of a medically determinable impairment is established, evidence from other sources may be used "to show the severity of [a claimant's] impairment(s) and how it affects [their] ability to work." *Id*. § 416.913(d). These "other sources" explicitly include public and private social welfare agency personnel, as well as non-medical caregivers. *Id*. §§ 416.913(d)(3)-(4). As such, the opinion of Ann Millet, Johnson's psychiatric social worker, is an appropriate source for the ALJ to use in determining the severity and limiting effects of Johnson's non-exertional impairments.

The question remains however, whether substantial evidence supports the assumptions on which the vocational expert based his opinion. Johnson argues that the opinion of an acceptable medical source, consultative psychiatrist Dr. Barry, which noted more severe non-exertional

-18-

limitations than those in the hypothetical question should have been incorporated into the hypothetical question.  Dkt. No. 10 at pp. 14-16.  However, because Dr. Barry was not a treating source, but a consultative psychiatrist, the ALJ was entitled to determine the weight of Dr. Barry's opinion according to: (1) the length of the treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) the supportability of the opinion; (4) the opinion's consistency with the record as a whole; (5) the physician's specialty; and (6) any other relevant factors.  20 C.F.R. §§ 416.927(d)(1)-(6); *Streeter v. Barnhart*, 2002 WL 467504, at * 17 (S.D.N.Y. Mar. 28,  2002).

In this instance, Dr. Barry saw Johnson one time, and that visit was not motivated by a desire for treatment, which weighs against giving the opinion significant deference.  *Streeter*, 2002 WL 467504, at * 17.  Moreover, the opinion of Dr. Barry is not only inconsistent with the opinion of Ms. Millet but with other physicians as well.  Both of the reviewing physicians, Dr. Fras, and Dr. Mata, completed an assessment of Johnson's capacity to sustain twenty different mental abilities over a normal workday and workweek.  Tr. at 233-34, 280-81.  These activities were broken into four categories: 1) Understanding and Memory, 2) Sustained Concentration and Persistence, 3) Social Interaction, and 4) Adaptation.  *Id*.  In almost all of the categories, the reviewing physicians found Johnson was not significantly limited, and in the remaining categories they found her only moderately limited.  *Id*.  These opinions, arrived at separately, seem to be in accord with the opinion of Ms. Millet, who assessed Johnson by rating her in fifteen categories in which she noted that Johnson's ability was either limited but satisfactory, or more than satisfactory in all categories.  Tr. at 293-94.  Dr. Barry's opinion is also at odds with the clinical psychiatric assessment completed by Dr. Prasad Lakshman and Ann Millet.  While Dr. Barry found Johnson's attention and

-19-

concentration, and recent and remote memory skills impaired due to Johnson's emotionality and anxiety, Dr. Lakshman and Ms. Millet found Johnson's thought processes logical and coherent, and her recent and remote memory adequate.  Tr. at 223 & 284.  Thus the opinion of Ann Millet, and not that of Dr. Barry, is supported by, and consistent with, the record as a whole.

Therefore, substantial evidence of record supports the assumptions which incorporate the opinion of Johnson's psychiatric social worker regarding Johnson's mental ability to do work related activities, which the vocational expert based his opinion on.  This in turn means that the validity of the ALJ's hypothetical question is supported by substantial evidence.

### 4.  Prior Application

Johnson's final contention is that her prior application for SSI should be reopened for good cause shown.  We find Johnson's contestation to be without merit.  Johnson argues that her prior application, filed on July 14, 1995, should be reopened for good cause shown, with the new and material evidence of her anxiety and dysthymia diagnoses constituting the good cause.  Dkt. N. 10 at pp. 17-18.  However, this argument fails for the reasons fully examined below.

Review of the decision not to reopen Johnson's prior application for SSI is not within this court's jurisdiction.  Except in two limited instances, "federal courts lack jurisdiction to review an administrative decision not to reopen a previous claim for benefits," inasmuch as the Commissioner's decision not to reopen a prior determination is "not a final decision for the purposes of [42 U.S.C.] § 406(g), and thus is generally unreviewable even if there was a hearing in the case."  *Byam v. Barnhart*, 336 F.3d 172, 179-80 (2d Cir. 2003) (citing, *inter alia*, *Califano v. Sanders*, 430 U.S. 99, 107-09 (1977) (delineating the Congressional purpose behind the time limits imposed on seeking judicial review of the Commissioner's decision as a policy designed to

-20-

"forestall repetitive or belated litigation of stale eligibility claims," which would be frustrated were claimants allowed to seek review simply by filing a petition to reopen with no further action)).  The two instances where federal courts have jurisdiction to review the Commissioner's decision not to reopen a prior determination are, where the Commissioner has constructively reopened the case, and where the claimant challenges the denial on Constitutional due process grounds.  *Id*. at 180. (quoting *Califano*, 430 U.S. at 109).

If the Commissioner reviews the entire record and renders a decision on the merits then he has constructively reopened the case, and the claim is subject to judicial review.  *Id*. (quoting *Malave v. Sullivan*, 777 F. Supp. 247, 251-252 (S.D.N.Y. 1991)).  In Johnson's case, the ALJ did not leave the answer to this question to implication, noting specifically that "no good cause having been established to reopen the 1995 application, [thus] evaluation of the claimant's alleged disability is based upon the present application."  Tr. at 16.  Because the ALJ did not review the entire record, nor render a decision on the merits of the previous SSI application, there has been no constructive reopening.  Further, Johnson has alleged no constitutional challenge to the Commissioner's decision not to reopen her prior application.  This leaves us lacking the jurisdiction to review the Commissioner's decision not to reopen Johnson's prior SSI application.

Moreover, even if this Court did have jurisdiction to review the Commissioner's decision not to reopen Johnson's prior application, her request to reopen the prior application for SSI is untimely.  According to the Regulations, a request to reopen an SSI determination for good cause must be made within two years of the date of the notice of the initial determination.  20 C.F.R. § 416.1488(b).  The two-year period is counted forward from the initial determination on the claim sought to be reopened.  *Singer v. Sec'y of Health & Human Serv.*, 566 F. Supp. 204, 210 (S.D.N.Y.

1983).  Therefore, "if more than two years has elapsed from the initial determination to be reopened

. . . reopening is no longer possible."  *Id.*

In Johnson's case, the initial determination she seeks to reopen was rendered on January 3,

1996.  Tr. at 16.  Counting forward two years from that date, Johnson's time to reopen for good

cause expired on January 3, 1998, which is over one year before she filed her current application for

SSI benefits, and almost three years prior to her filing the current application for judicial review.  Tr.

at 78; Dkt. No. 1, Compl.  Thus, Johnson's request to reopen her prior application for SSI is

untimely.

**WHEREFORE**, it is hereby

**RECOMMENDED** that the Commissioner's decision denying disability benefits be

**AFFIRMED**; and it is further

**ORDERED** that the Clerk of the Court serve a copy of this Report-Recommendation and

Order upon parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing

report.  Such objections shall be filed with the Clerk of the Court.  **<u>FAILURE TO OBJECT TO</u>**

**<u>THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.</u>**  *Roldan*

*v. Racette,* 984 F.2d 85, 89 (2d Cir. 1993); *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15

(2d Cir. 1989); 28 U.S.C. § 686(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).


Dated: June 8, 2004
        Albany, New York


RANDOLPH F. TREECE
United States Magistrate Judge